**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

KATHIAN MARIE LOPEZ-CONCEPCION, et al.,

Plaintiffs,

v.

CARIBE PHYSICIANS PLAZA CORP., et al.,

Defendants.

CIVIL NO. 21-1360 (HRV)

## OMNIBUS MEMORANDUM AND ORDER

### I.    INTRODUCTION

This is a diversity jurisdiction medical malpractice action brought by plaintiffs Kathian Marie López-Concepción and Lenymar López-Concepción (hereinafter "plaintiffs") seeking to recover damages for the alleged wrongful death of their late father, Angel I. López-Diaz ("Mr. López"). The defendants are Caribe Physicians Plaza Corporation d/b/a Caribbean Medical Center ("CMC"), and doctors Benny Nieves Matías, Iolani García-Rosario and Cristina Ortiz-García (hereinafter "defendants").

The defendants jointly move *in limine* to exclude the testimony of plaintiffs' expert witness, Dr. Edwin Miranda-Aponte (hereinafter "Dr. Miranda"), pursuant to Fed. R. Evid. 702, Fed. R. Civ. P. 26(a)(2)(B), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), 113 S. Ct. 2786, 125 L. Ed. 2d 469, (1993).

1

Plaintiffs, in turn, request the exclusion of two experts announced, respectively, by co-defendants Dr. Cristina Ortiz-García and Dr. Iolani García-Rosario: Drs. Wilfredo Nieves-Colomer ("Dr. Nieves") and Alvaro Reymunde ("Dr. Reymunde"). (Docket No. 87).[1]

For the reasons set forth below, the motion *in limine* as to Dr. Miranda is denied, whereas the motion *in limine* as to Drs. Nieves and Reymunde is granted.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

According to the allegations in the amended complaint and other undisputed evidence in the record, on February 27, 2020, at approximately 2:47 PM, Mr. López arrived by ambulance to the emergency room of CMC. He had experienced multiple episodes of vomiting after accidentally ingesting what was initially thought to be a spoiled or rotten sports drink. Co-defendant Dr. Cristina I. Ortiz-García (hereinafter "Dr. Ortiz") first evaluated Mr. López upon his arrival at the emergency room. The chief complaint noted by a triage nurse was abdominal pain, vomiting and dehydration. The physical evaluation conducted at that time revealed that Mr. López was oriented and showed no abnormal findings in the heart, lungs, abdomen, and extremities. Dr. Ortiz ordered laboratory testing; that Mr. López be given antiemetic and antiacid medication; and that he be provided intravenous fluids, among others. Laboratory testing showed signs of renal insufficiency and confirmed dehydration. Dr. Ortiz

---

[1] Plaintiffs motion *in limine* also requests the exclusion of the expert report of Dr. Andres Britt, the expert announced by co-defendants CMC and Dr. Benny Nieves-Matías, on the grounds that it is in the Spanish language and no certified English translation has been submitted. On August 1, 2024, these co-defendants filed an Informative Motion notifying that they had submitted the English translation of Dr. Britt's expert report. (Docket No. 96). The request to exclude on those grounds has thus been rendered moot.

finished her shift at 5:00 PM. She did not review the results of the laboratory tests and there is no evidence in the record that she prepared a hand-off note for her successor or that she consulted any a specialist in internal medicine, nephrology, or intensive care.

At approximately 6:30 PM on February 27, 2020, family members of Mr. López confirmed that the substance he had ingested was Roundup, a herbicide containing glyphosate. They took the bottle with the substance to CMC at around 7:00 PM. A nurse kept the bottle.

By that time, Mr. López was under the care of co-defendant Dr. Benny Nieves-Matias ("Dr. Nieves-Matias"). It is unclear when Dr. Nieves-Matias had his first direct interaction with Mr. López. A note at approximately 9:04 PM documents unsuccessful efforts to transfer Mr. López to other medical institutions, apparently as per the recommendation of Dr. Ubaldo Santiago, the director of internal medicine at CMC. The note also states that given the failure to secure a transfer, the recommendation by "Dr. A. Rivera", CMC's Medical Director was to keep Mr. López at the emergency room "for follow-up with treatment recommended by the Poison Control Center." (Docket No. 39 at ¶ 13).

Dr. Nieves-Matias allegedly made a consultation with the Poison Control Center ("PCC") earlier but found the advice unhelpful. Said consultation was not documented. At 9:13 PM, after noting that Mr. López was in acute pain, Dr. Nieves-Matias ordered additional medication and testing, specifically Protonix, Demrol [sic], Sodium bicarbonate and CT scans of the Thorax, Abdomen and Pelvis. The infusion rate of intravenous liquids was not changed. Mr. López remained at the emergency room. At 3:19 AM on February 28, 2020, Dr. Nieves-Matias entered a final note in the medical

record with a final diagnosis of "Caustic Solution Accidental Ingestion" and characterizing the condition of Mr. López as "stable."

The medical records show that the next re-evaluations of Mr. López were carried out at 8:42 AM and 10:21 AM on February 28, 2020, by Dr. Daniel López-Infante (hereinafter "Dr. López-Infante"). The 10:21 AM note reflects a condition of acute renal failure and a consultation with internal medicine and nephrology specialists who suggested aggressive IV hydration, central line placement and foley catheter, along with close monitoring of the patient's renal function. Shortly thereafter, at 10:27 a.m., the consultation with nephrologist Dr. Angel R. Sánchez-Martínez was documented noting a finding of acute kidney injury stage 3, the need for aggressive treatment for poisoning and, among other things, the transfer of Mr. López to the intensive care unit (ICU).

Dr. López-Infante also memorialized at around 10:30 AM that he had a consultation with co-defendant Dr. Iolani García-Rosario (hereinafter "Dr. García-Rosario"), an internal medicine specialist.[2] Dr. García-Rosario vehemently denies being consulted at that time. In fact, according to her schedule, she would have been physically present at the hospital at the time of the consult. She claims that the first consultation was at approximately 9:00 PM when she discussed the case with Dr. Michelle M. Dumas-Rosa ("Dr. Dumas-Rosa").  She was at her home when she received

---

[2] At the time of the facts of this case, Dr. García-Rosario was part of a group of internal medicine specialists who mutually covered the patients of other members of the group and covered consults of the emergency room at CMC.  She was the internal medicine specialist on duty at the time Mr. López arrived at the CMC. It was her practice to spend the day at the hospital when she was on duty even though she has a private office. (*See* Docket No. 73 at 39-40).

4

the call. Dr. García-Rosario issued medical orders comprising 37 items and intended to follow up on her orders and treatment the next day. However, Mr. López had by then passed. On the other hand, according to his deposition testimony, after Dr. López-Infante consulted the case with internal medicine at around 10:30 AM (a fact that is, again, disputed), he had no further involvement with Mr. López.

Except for a note at 11:49 AM showing that Dr. Miguel De Jesús-Ramos, a surgeon, successfully placed a central venous line, there appears to be no further indication of relevant events or follow ups on February 28, 2022, until approximately 7:00 PM. A nurse documented having received a patient that had been consulted to Dr. García-Rosario, and that Dr. Ortiz was notified about the patient's vomiting. It is alleged that aside from ordering the antiemetic Zofran, there was no adjustment to the IV fluid rate by Dr. Ortiz nor a call to the PCC as recommended by the nephrologist earlier. At 9:00 PM, the same nurse reported Mr. López being restless, anxious, and vomiting. According to the plaintiffs, Dr. García-Rosario and Dr. Ortiz simply continued treating the symptoms of Mr. López and kept him under observation for more than 12 hours without any type of affirmative action despite rapid deterioration.

At 10:34 PM, the medical record reflects that Dr. Dumas-Rosa ordered the admission of Mr. López into the ICU. Dr. Dumas-Rosa stated that it was necessary to contact the PCC due to the patient's intake of glyphosate and described Mr. López' condition as "poor" and "critical." However, there is no indication that the PCC was called at that time or that Mr. López was moved from the emergency room to the ICU, as per plaintiffs' averments. In an evaluation conducted by Dr. Dumas-Rosa at 11:03 PM, she encountered Mr. López suffering from several severe symptoms, including

shortness of breath, tachycardia, hypertension, anxiety, disorientation, abdominal pain, nausea, vomiting, and urinary retention.  In the "assessment and plan" section of the note, Dr. Dumas-Rosa indicated to continue with treatment according to medical order and PCC recommendation. The note does not specify what the treatment was nor the PCC's recommendation.  Mr. López went into cardiac arrest shortly thereafter.

Between 2:17 AM and until the time of his death at 5:48 AM, Mr. López suffered seven cardiorespiratory arrests, all at the emergency room.  He was never transferred to the ICU as ordered.

The present action was commenced on August 5, 2021, with the filing of the original complaint. (Docket No. 1). The plaintiffs brought causes of action for negligence and damages under articles 1802 and 1803 of the then-in effect Puerto Rico Civil Code, 31 P.R. Laws. Ann. §§ 5141 and 5142.  (*Id.*)  The complaint was subsequently amended on May 30, 2022. (Docket No. 39). Trial is currently set to begin on August 12, 2024 (Docket No. 78), after efforts to resolve the case by way of settlement were unsuccessful. (*See* Docket No. 80).

On July 19, 2024, the defendants filed their joint motion *in limine* to exclude plaintiffs' expert, Dr. Miranda. (Docket No. 84). Plaintiffs opposed on August 4, 2024. (Docket No. 103). Co-defendant CMC filed a motion to "quash" plaintiffs' opposition primarily on the ground that the opposition at Docket No. 103 includes two attachments in Spanish and that for that reason, it should be deemed as tendered but not filed. (Docket No. 109)  CMC's pleading also cites a case from this district in which Dr. Miranda was excluded and reiterates that Dr. Miranda lacks the qualifications to testify as an expert in this case. (*Id.* at 2-3)  This motion has been joined by Dr. Nieves-

Matías and cites an additional case in which Dr. Miranda was excluded. (Docket No. 110) [3]

Plaintiffs filed their own motion *in limine* to exclude the announced experts of co-defendants Dr. Ortiz and Dr. Garcia-Rosario. However, these co-defendants have not filed a response in opposition which was due, yesterday, August 5, 2024. I deem the plaintiffs' motion *in limine* as unopposed. *See* Local Rule 7(b).

## III.    APPLICABLE LAW AND DISCUSSION

The defendants claim in their motion *in limine* that Dr. Miranda must be excluded because he lacks the qualifications to offer an opinion in this case. Specifically, they argue that because his medical training is limited to basic training as a general practitioner who was grandfathered as emergency room practitioner, he lacks the credentials and/or experience in providing treatment for severe intoxication of

---

[3] I will not strike plaintiffs' opposition. I will simply disregard, as I must, the exhibits that are non-compliant with Local Rule 5(g) and any argument that is supported by said exhibits. *See Lignos-Lopez v. Servicios de Terapia Educativa Girasol, Inc.,* Civil No. 22-1419 (MAJ), 2024 WL 1241613, 2024 U.S. Dist. LEXIS 57071, at *16 n.7 (D.P.R. Mar. 22, 2024). With those exhibits—which are not dispositive—set aside, the matter is sufficiently briefed for the Court to be able to rule. The motion to quash at Docket No. 109 is **DENIED**.  I also note that while co-defendants cite two cases in which Dr. Miranda was supposedly excluded by the Court, they neglect to cite other cases in which the Court allowed Dr. Miranda to testify as an expert or considered his testimony and opinions in different contexts. *See, e.g., Cruz-Mendez v. United States*, 892 F. Supp. 2d 369 (D.P.R. 2012); *Caban v. Centro-Medico del Turabo*, Civil No. 22-1019 (GMM), 2023 WL 5959189, 2023 U.S. Dist. LEXIS 163813 (D.P.R. Sept. 13, 2023)(summary judgment context); *Flores v. S.M. Med. Servs., C.S.P.*, Civil No. 18-1494 (RAM), 2020 WL 13490521, 2020 U.S. Dist. LEXIS 265176 (D.P.R. Jul. 21, 2020)(denying motion in limine to exclude Dr. Miranda); *Negron-Colon v. Hosp. Episcopal San Lucas*, Civil No. 08-1078 (JAF), 2010 U.S. Dist. LEXIS 90090 (D.P.R. Aug. 30, 2010)(summary judgment context); *Garcia-Santiago v. Collado-Pacheco*, Civil No. 07-1682 (JAG), 2009 U.S. Dist. LEXIS 144020 (D.P.R. Nov. 5, 2009)(same); *Torrales v. Caribbean Hotel Developers*, Civil No. 13-1615 (CCC), Docket No. 96 (D.P.R. Jul 10, 2015)(denying motion in limine to exclude Dr. Miranda).  In the case cited by Dr. Nieves-Matias in his motion for joinder (Docket No. 110), the Court did not exclude Dr. Miranda.  His testimony was limited after Plaintiff acquiesced that his experts not opine at trial "as to the alleged negligence by the Hospital nursing and/or non-medical staff for failure to state the applicable standard of care." *Calderon-Amezquita v. Rivera-Cruz*, Civil No. 17-2197 (RAM), 2021 WL 10353442, 2021 U.S. Dist. LEXIS 264308 (D.P.R. Nov. 18, 2021).

substances like glyphosate. Defendants also highlight that Dr. Miranda's license has expired, that he has not taken continuing medical education since 2016, and that his experience is limited to being an emergency room specialist. As such, he never handled a case of glyphosate poisoning.

Plaintiffs motion *in limine*, on other hand, is not based on lack of qualification grounds, but on the insufficiency of Dr. Nieves and Dr. Reymunde's expert reports. According to plaintiffs, the reports and conclusions offered by the experts are nothing more than "a series of ipse dixit, subjective beliefs and unsupported speculations." (Docket No. 87 at 3). Plaintiffs argue that their lack of compliance with Fed. R. Evid. 702 and Fed. R. Civ. P. 26(a)(2)(B) makes their testimony inadmissible.

## A. Legal Framework

In Puerto Rico, to establish a prima facie case of medical malpractice, a plaintiff must establish "(1) a duty owed (*i,e.,* the minimum standard of professional knowledge and skill required in the relevant circumstances), (2) an act or omission transgressing that duty, and (3) a sufficient causal nexus between the breach and the claimed harm." *Cortes-Irizarry v. Corp. Insular de Seguros*, 111 F.3d 184, 189 (1st Cir. 1997). Puerto Rico health care professionals are held to a national standard of care. *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 394 F.3d 40, 43 (1st Cir. 2005).

Moreover, under Puerto Rico law, a health care provider "is presumed to have exercised reasonable care in the discharged of his functions." *Lopez-Rivera v. Hosp. Auxilio Mutuo, Inc.*, 247 F. Supp. 3d 185, 187 (D.P.R. 2017)(*quoting Medina-Santiago v. Velez*, 20 P.R. Offic. Trans. 399, 404, 120 D.P.R. 380, 385 (P.R. 1998)). Accordingly,

plaintiffs have the burden to rebut this presumption. *See Borges v. Serrano-Isern*, 605 F.3d 1, 7 (1st Cir. 2010). "Thus, 'a plaintiff bent on establishing a breach of a physician's duty of care ordinarily must adduce expert testimony to limn the minimum acceptable standard and confirm the defendant doctor's failure to meet it.'" *Soto-Gonzalez v. Drs' Ctr. Hosp.*, Civil No. 20- 0431 (GMM), 2024 WL 753565, 2024 U.S. Dist. LEXIS 34463, at *9 (D.P.R. Feb. 23, 2024)(*quoting Cortes-Irizarry*, 111 F.3d at 190); *Borges v. Serrano-Isern*, 605 F.3d at 7 (A plaintiff has the "obligation to refute this presumption by adducing [expert] evidence sufficient to show both the minimum standard of care required and the physician's failure to achieve it.")

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony at trial. It provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of the expert evidence has the burden of establishing both its reliability and relevance. *Martinez v. United States*, 33 F.4th 20, 24 (1st Cir. 2022).

When presented with a challenge to the admissibility of expert testimony, the Court "must determine whether the expert witness is qualified and has the specialized

9

knowledge that will 'assist the trier of fact to understand evidence or to determine a fact in issue.'" *Bogosian v. Mercedes-Benz of N. Am.*, 104 F.3d 472, 476 (1st Cir. 1996)(*quoting* Fed. R. Evid. 702). In this two-part inquiry, the Court must initially assess the qualifications of the proposed expert by "knowledge, skill, experience, training or education." *Id.*; *see also Mitchell v. United States*, 141 F.3d 8, 14 (1st Cir. 1998). As to the second part of the inquiry, in *Daubert*,[4] "the Supreme Court assigned to trial judges the role of gatekeepers to screen expert testimony that although relevant, was based on unreliable [] methodologies." *Gonzalez-Perez v. Gomez-Avila*, 296 F. Supp. 2d 110, 113 (D.P.R. 2003)(Arenas, M.J.).

In discharging its gatekeeper responsibility to determine reliability, the Court must consider whether: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Negron v. Worthinton Cylinder Corp.*, Civil No. 17-1985 (RAM), 2021 WL 1199014, 2021 U.S. Dist. LEXIS 63251, at *7 (D.P.R. Mar. 30, 2021)(*quoting Gonzalez-Arroyo v. Doctor's Ctr. Hosp. Bayamon, Inc.*, Civil No. 17-1136 (RAM), 2020 U.S. Dist. LEXIS 140016, 2020 WL 4516012, at *2 (D.P.R. Aug. 5, 2020)). "The Rule 702 inquiry is a 'flexible one', . . . , and there is no particular procedure that the trial court is required to follow in executing its gatekeeping function under *Daubert*." *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002).

---

[4] *Daubert*, 509 U.S. at 597.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B. Analysis**

### 1. *Defendants' Motion in Limine – Dr. Miranda*

In their motion, defendants argue that Dr. Miranda is unqualified to render reliable testimony because he is not a toxicology expert and never treated a glyphosate poisoning while working as an emergency room physician. Plaintiffs counter that Dr. Miranda's testimony is both reliable[5] and relevant, as required under *Daubert*, and that he is amply qualified.

Dr. Miranda is a licensed Specialist in Emergency Medicine with over 36 years of professional experience in Direct Care, Administrative, Operations Management, Aero-Medical Transport, and Academic Medicine. (Docket No. 84-1). From 1983 through 2019, he held an unrestricted current permanent license to Practice Medicine and Surgery issued by the Puerto Rico Board of Medical Examiners. (*Id.*) His Curriculum Vitae shows that he worked as an emergency room physician from 1994 through 2018 at Centro Médico. (*Id.*) For a span of 8 years, he was the emergency room director at that same institution (2001-2009). (*Id.*). Between 2009 and 2013, he was a medical services department director. (*Id.*). Dr. Miranda was also a Professor at the University of Puerto Rico School of Medicine during the years 1983 through 1994. (*Id.*)

I find that the above-outlined educational background and professional experience are sufficient to satisfy the requirement that a proposed expert witness be

---

[5] To render his opinion, Dr. Miranda examined Mr. López's medical records at the Caribbean Medical Center emergency department dated February 27 to February 29, 2020, the Autopsy Report PAT-0981-20 from the Forensic Sciences Institute dated November 4, 2020, and the scientific bibliographic references. (Docket No. 103-1 at 39).

qualified by "knowledge skill, experience, training, or education." Fed. R. Evid. 702. Defendants' contention that he is not qualified because his medical training is limited to the "basic medical training as a General Practitioner" with no academic background or medical experience in toxicology, misses the mark. Dr. Miranda has ample experience as an emergency room physician (from 1994-2018) and emergency room director (from 2001-2009). Throughout his extensive career, he has also held other leadership positions in the medical field, such as Medical Services Department Director of the Puerto Rico Medical Center San Juan, Puerto Rico (from 2009-2013).

In a medical malpractice case, an expert "need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline." *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planaificacion Familiar*, 345 F.3d 15, 24 (1st Cir. 2003); *see also Clemente Vizcarrondo v. United States,* No. CV 17-1144 (RAM), 2020 WL 748840, at *4 (D.P.R. Feb. 14, 2020)(internal citations omitted)("The First Circuit has clearly established that physicians do not need to be specialists in a certain field to be qualified experts. In any case, an expert physician's area of expertise would only affect the weight of their opinion, not its admissibility.")  "It is not required that experts be 'blue ribbon practitioners' with optimal qualifications." *United States v. Vargas*, 471 F.3d 255, 262 (1st Cir. 2006)(*quoting United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006)).

Dr. Miranda does not need to be an expert in toxicology to render an opinion regarding the treatment of Mr. López at CMC's emergency room for ingesting a poisonous substance. Even more so when the allegations in this case all relate to treatment of Mr. López in the emergency room, as he was allegedly never admitted to

the regular ward or the intensive care unit. (Docket No. 1 at ¶¶ 21, 25). Thus, even though Dr. Miranda affirmed in his deposition that he never treated a patient with glyphosate poisoning,[6] (Docket No. 84-2 at 11, lines 2-5), his expertise as an emergency room physician qualifies him to testify on whether the defendants failed to abide by the accepted standards of care in managing Mr. López's condition at the emergency room. (Docket No. 1 at ¶27). *See Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir. 1985)(holding that an expert must possess some specialized knowledge of the field in which he purports to be an expert, but does not need to have specialized knowledge as to the specific question at issue.); *see also E.L.A.C. v. Hop. Hermanos Melendez, Inc.*, 17 F. Supp. 3d 158, 161 (D.P.R. 2014)(declining to exclude gynecologist even when proposed expert did not have training or professional experience in hearing conditions.).

The admission of Dr. Miranda's testimony does not prevent defendants from presenting their own expert to refute his opinion at trial, or from confronting him through cross examination with matters that go to credibility or the weight, if any, that the jury will assign to his opinions. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instructions on the burden of proof are the traditional and appropriate means of attacking shaky but admissible

---

[6] For comparison, plaintiffs point out that Dr. Britt, who is a medical toxicology specialist, mentioned in his deposition that during his residency in Penn State University he had only treated, personally, "approximately two patients" with minor ingestions of glyphosate. While practicing as an emergency doctor in Puerto Rico, he has never treated a patient for glyphosate poisoning, much less with acute renal injury as a result of a glyphosate ingestion. (Docket No. 103-5 at 45, lines 20-25 and 46, lines 1-17).

evidence."); *see also Milward v. Acuity Specialty Prod. Grp., Inc.,* 639 F.3d 11, 15 (1st Cir. 2011)("So long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversarial process.").

Plaintiffs also challenge Dr. Miranda's qualifications because his medical license was expired when he rendered his report. Dr. Miranda retired from the practice of medicine in 2018 and his license expired in 2022. Plaintiffs have not explained how the expiration of Mr. Miranda's license undermines his credibility or makes his testimony unreliable.

The case of *Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.*, 613 F.3d 54, 59 (1st Cir. 2010) is illustrative and in line with *Daubert* and *Milward*. In *Cruz-Vazquez*, the First Circuit vacated an order from the district court excluding the testimony of plaintiff's sole expert witness at trial. The district court had ruled that the doctor was biased in favor of plaintiffs in medical malpractice cases. Among the facts that the district court considered was that the doctor had not been a practicing physician for the last seven years and had focused on a variety of consulting work, including consulting as an expert witness in approximately 150 cases. In reversing, the First Circuit determined that the district court went beyond the scope of the scientific validity inquiry required to assess admissibility. Instead, it found that the district court "cited as the basis for excluding Dr. Ramírez's testimony aspects of his work that are typically established through cross-examination of an expert witness at trial in an effort to discredit his or her testimony." *Id.* I follow the same rationale here.

Upon careful consideration of Dr. Miranda's report and qualifications, I find that he has the necessary degree of specialized knowledge to assist the trier of fact in

understanding the evidence and facts in issue in this case. Co-defendants' joint motion *in limine* to exclude the testimony of Dr. Miranda, (Docket No. 84), is DENIED.

### 2. *Plaintiffs' Motion in Limine — Drs. Nieves and Reymunde*

Plaintiffs proffer the same grounds for exclusion of Dr. Nieves and Dr. Reymunde, namely that the expert reports contain only unsupported conclusions and fail to delineate the principles and methodology used.

"[T]o ensure reliability and intellectual rigor, experts 'must be able to produce a written report or testimony supported by an accepted methodology that is based on substantial scientific, technical, or other specialized knowledge.'" *Clemente-Vizcarrondo,* 2020 WL 748840, at *2 (*quoting Figueroa v. Simplicity Plan de Puerto Rico*, 267 F. Supp. 2d 161, 164 (D.P.R. 2003)). In addition, expert reports must comply with rule 26(a)(2)(B) which requires:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B); *Ortiz-Oliveras v. Doctors'Ctr. Hosp., Inc.*, Civil No. 21-1169 (HRV), 2024 WL 2399118, 2024 U.S. Dist. LEXIS 93969 (D.P.R. May 23, 2024).

### a. *Dr. Nieves*

Dr. Nieves's report states that he was asked to review the medical record of Mr. López with particular attention to the care provided by Dr. Ortiz at CMC's emergency department in February 2020. (Docket 87-1). To render his opinion he reviewed the complaint, the answer to complaint[7], Dr. Miranda's expert report, CMC's medical records, and the autopsy report. (*Id.*).

Even under the most flexible standards, Dr. Nieves's three-page report does not fulfill the requirements of Rule 26(a)(2)(B). There is no list of his qualifications; no mention of other cases where he has testified; and no statement of the compensation he received for the study and testimony in the case.

Our Circuit views these omissions as "significant." *See Pena–Crespo v. Puerto Rico,* 408 F.3d 10, 13–14 (1st Cir.2005)("The one-page statement of the expert's opinion, submitted to the court more than one month later, did not by any means satisfy her obligation to provide an expert report. That statement consists of two conclusory paragraphs. Among other deficiencies, it does not contain a list of Dr. Rodríguez's publications; it does not spell out his compensation arrangement; and it does not enumerate the other cases in which he testified as an expert. These are significant omissions.").[8]

---

[7] Dr. Nieves does not indicate which co-defendant's answer to the complaint he reviewed or whether he reviewed them all.

[8] Defendants have not explained the reason for the report's noncompliance. "The burden of showing that any noncompliance with Rule 26's requirements is justified or harmless is on the party seeking to admit the testimony. *See Martinez*, 33 F.4th at 24 (*citing Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21 (1st Cir. 2001)).

More importantly, as plaintiffs point out, Dr. Nieves's report did not reference any additional data, medical literature, or treatises that he reviewed or considered. "When a proffered expert physician's report lacks any medical literature, data, or even a more basic explanation of how their conclusion was reached...said report is inherently unreliable." *Clemente-Vizcarrondo*, 2020 WL 748840, at \*5. Even a mere citation might not suffice. In *Santa Cruz-Bacardi v. Metro Pavia Hosp., Inc.*, No. CV 16-02455 (RAM), 2019 WL 3403367, at \*4 (D.P.R. July 26, 2019), the court excluded a doctor's expert report even though the expert cited two items of medical literature. The court reasoned that even though "on the surface" the medical literature cited supported the report's conclusion, the report failed to tie the cited articles to the defendant's actions or omissions. *Id.*

Plaintiffs also challenge the basis of Dr. Nieves's conclusions, which they deem as ipse dixit, meaning the expert's own "unsupported assertions." *See Collision Commc'ns, Inc. v. Nokia Sols. & Networks OY*, 691 F. Supp. 3d 360, 368 (D.N.H. 2023). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997). The cornerstone of Fed. R. Evid. 702 is that the evidence be "relevant" or "reliable" which means that it "must help the trier of fact to understand the evidence or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 80 (1st Cir. 1998)(citing Fed. R. Evid. 702).

Under that lens, I examine Dr. Nieves's report. The conclusions in Dr. Nieves's report are so sparse, they can be reproduced here in their entirety.[9]

> The patient's arrival clinical picture was a case of food poisoning, with vomiting as the main symptom. For this condition Dr. Ortiz adequately ordered the medication Promethazine 50 mg injection for vomit control and the gastric antacid Pepcid 20 mg. The use of nasogastric lavage or the administration of activated charcoal are not indicated in the emergency department management of food poisoning.

> Dr. Ortiz correctly ordered the administration of 1 liter of saline solution followed by the infusion of 100 ml per hour. She also ordered relevant laboratory tests of CBC, BMP, liver function tests, amylase, and lipase.

> ....

> The intervention of Dr. Cristina Ortiz García with Mr. Angel I. López Díaz at the emergency department at Caribbean Hospital on February 27, 2020, was adequate. The information of an accidental toxic substance ingestion by Mr. Lopez was brought to the attention of the institution after Dr. Ortiz had finished her work shift.

(Docket No. 87-1 at 2-3).

Dr. Nieves's input offers little that could not be obtained from the medical records. The report does not identify a national standard of care, nor does it state how Dr. Ortiz adhered to that standard of care. As stated above, establishing a minimally acceptable standard of care and a breach thereof is a requirement of medical

---

[9]"The question of reliability or support goes to the expert's process for reaching his opinion and not the conclusions themselves. Still, the court must consider the expert's conclusions to check that there is not 'too great an analytical gap between the data' and the conclusion." *Collision Commc'ns, Inc. v. Nokia Sols. & Networks OY*, 691 F. Supp. 3d 360, 368 (D.N.H. 2023)(*citing Gonzalez-Arroyo v. Doctors' Ctr. Hosp. Bayamon, Inc.*, 54 F.4th 7, 14 (1st Cir. 2022)).

malpractice actions in Puerto Rico. *See Martinez-Serrano v. Quality Health Servs. Of Puerto Rico, Inc.*, 568 F.3d 278, 285 (1st Cir. 2009).

Likewise, the report does not guide us through Dr. Nieves' analytical process to reach the conclusion that no standard of care was breached. If Dr. Nieves was relying solely or primarily on his own experience, he was required to "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Zolot*, 968 F. Supp. 2d 411, 430 (D. Mass. 2013)(*citing Brown v. Wal–Mart Stores, Inc.*, 402 F. Supp. 2d 303, 308 (D.Me.2005) and Fed. R. Evid. 702 advisory committee's note). Those explanations are conspicuously absent from the report.

I thus find that Dr. Nieves's report lacks both in form and content. His report does not comply with Rule 26(a)(2)(b) and Fed. R. Evid. 702, and the analytical gap between the data and the conclusion is far too wide for him to testify as an expert witness. Therefore, I grant the motion *in limine* as to Dr. Nieves.

### b. Dr. Reymunde

Dr. Reymunde's report fares no better. He examined the participation of Dr. García-Rosario during Mr. López' hospitalization. (Docket No. 87-2).[10] To prepare his

---

[10] Plaintiffs point out that as per the modified discovery schedule approved by the court, codefendants were to produce their expert reports by June 5, 2023. (Docket Nos. 57 and 60). Dr. García-Rosario notified Dr. Reymunde's report to plaintiffs on June 30, 2023. (Docket No. 87 at pg. 2). Although the untimeliness of Dr. Reymunde's report is not, in and of itself, a sufficient reason to exclude its admission, it is yet another noncompliant element that weighs in favor of exclusion.

report, Dr. Reymunde reviewed the complaint and the corresponding answers[11]; interrogatories; the medical records of CMC; Dr. Miranda's report and literature; and the autopsy findings. (*Id.*).

Dr. Reymunde opines that the mechanism that is triggered with the poison ingestion ("oxidative stress") was already damaging Mr. López's organs when he was admitted to the emergency room. And that there was nothing the doctors could have done because there's no antidote for ingesting glyphosates. (*Id.* at 3). He estimates that even though the exact amount that Mr. López consumed was not known, based on the first blood results when he arrived, it can be predicted that he had taken at least 300ml more than 2 hours before. (*Id.*). The following exams showed even higher inflammatory markers. (*Id.*). Dr. Reymunde thus concludes that "[a]t that point the 'cascade' was again on its natural catastrophic course despite the treatment offered by the physicians since there is not [sic] antidote available for the glyphosates." (*Id.*). In fact, he categorically states that other treatments that could have been attempted, such as dialysis, would have been futile because "the damage was already done." (*Id.* at 4).

Regarding Dr. García-Rosario's care, he states that her decisions and medical criteria did not deviate from the standards of medical practice since she was in constant contact with the in-house physicians even when she wasn't there in person to check on the patient. (*Id.*). Although Dr. García-Rosario was allegedly the admitting physician[12],

---

[11] The report does not indicate whether Dr. Reymunde examined the responses of all codefendants. Likewise, Dr. Reymunde did not specify which interrogatories he reviewed.

[12] Plaintiffs question whether Dr. García-Rosario in fact entered Mr. López admission order to the ICU. (Docket No. 39 at ¶ 19).

the management of Mr. López's condition was later conducted by the in-house physicians who checked in with Dr. García-Rosario via telephone. (*Id.* at 3). His opinion states that "[n]either [Dr. García-Rosario's] actions nor medical criteria are related to the outcome of the patient." (*Id.* at 4).

As was the case with Dr. Nieves's expert report, Dr. Reymunde's did not comply with all the requisites of Fed. R. Civ. P. 26(a)(2)(B). His report failed to include a list of all other cases in which, during the previous 4 years, he testified as an expert at trial or by deposition; and a statement of the compensation to be paid for the study and testimony in the case.

The report was also missing any reference to medical literature and standards of care. Dr. Reymunde admittedly based his opinion on his vast experience, which includes medical training; board certifications and recertifications; years of experience as a practicing physician; and his teaching appointment at the Ponce Health Science University and Damas Hospital Internal Medicine Residency Program. (*Id.* at 2). His report, however, does not delve into how his experience led to the conclusions he reached, nor how that experience can be reliably applied to the facts.

Concerning the standards of care, Dr. Reymunde does not enunciate what that standard is or why he understands that Dr. García-Rosario's actions or medical decisions had no bearing on the outcome of Mr. López' health condition. The Court is left to wonder what the reasoning or the methodology are underlying his conclusions and whether they are scientifically valid and applicable to the facts in issue. An expert's opinion "must be supported by appropriate validation" and rely on "more than subjective belief or unsupported speculation." *Rodriguez v. Hosp. San Cristobal, Inc.*,

91 F.4th 59, 70 (1st Cir. 2024)(*citing Daubert*, 509 U.S. at 590); *see also Clemente-Vizcarrondo*, 2020 WL 748840, at *2 (*quoting Figueroa v. Simplicity Plan de Puerto Rico*, 267 F. Supp. 2d at 164 (To ensure the reliability of an expert report, experts "must be able to produce a written report or testimony supported by an accepted methodology that is based on substantial scientific, technical, or other specialized knowledge.")

Dr. Reymunde's conclusory opinion that nothing could be done by the medical personnel at CMC is not supported by an explanation of the principles and methods he used to arrive at it. Likewise, the Court is left to guess how he estimated the amount of glyphosate Mr. López consumed, and the time elapsed between the ingestion of the poison and the arrival at the emergency room. "Failure to provide a ... report detailing the basis for the expert's opinion in a comprehensive scientific manner can cause the expert witness and his report to be eliminated from trial." *Clemente-Vizcarrondo*, 2020 WL 748840, at *2 (*citing* Justo Arenas & Carol M. Romey, Professional Judgment Standard and Losing Games for Psychology, Experts and the Courts, 68 Rev. Jur. U.P.R. 159, 180 (1999)).

Consequently, I also grant plaintiffs' motion *in limine* as to Dr. Reymunde.

## IV.    CONCLUSION

In view of the above, the defendants' motion *in limine* at Docket No. 84 is DENIED. The plaintiffs' unopposed motion *in limine* at Docket No. 87 is GRANTED as to the exclusion of the reports and testimonies of Dr. Nieves and Dr. Reymunde. The request to exclude the report of Dr. Britt as an identification is denied as MOOT.  The Motion to Quash at Docket No. 109 is DENIED.  The motion for joinder at Docket No. 110 is GRANTED.

**SO ORDERED**

In San Juan, Puerto Rico this 7th day of August, 2024.

S/Héctor L. Ramos-Vega
HÉCTOR L. RAMOS-VEGA
UNITED STATES MAGISTRATE JUDGE
